United States District Court

District of Massachusetts

Michael Franklin Matos

                                                    Civil Action

   V.                                               No._____

Seton Hall University, an Educational Corporation of New Jersey


Parties and Jurisdiction

1.  The plaintiff is a resident of Shrewsbury, Worcester County, Massachusetts, and a citizen
    of the United States.

2.  The defendant is Seton Hall University, legally incorporated as Seton Hall University, an
    Educational Corporation of New Jersey. Its principle place of business is in South
    Orange, Essex County, New Jersey.

3.  This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1332.


Facts Relevant to Claims

1.  In February 2013, the plaintiff experienced a depressive episode and was diagnosed with
    Major Depressive Disorder. In order to responsibly deal with the depressive episode and
    the severe anxiety it was triggering, the plaintiff made the personal choice to withdraw
    from Seton Hall University based on his fear that finishing out the semester in the midst
    of trying to overcome these mental health issues would have cost him his University
    Scholarship of $22,500, awarded annually. This is because under the terms of this
    scholarship the plaintiff was obligated to maintain a cumulative 3.0 grade average which
    the plaintiff did not feel he could do for that semester given how his mental health was

affecting his ability to study.  Amongst the people who became aware of this decision was Seton Hall University Dean of Students, Karen Van Norman.

2.  By both his own account and others, when the calendar reached August 2013, the plaintiff had emerged from the depressive episode. School psychiatrist Dr. Evans issued a finding before his return certifying that he could manage university life despite his past mental health concerns.

3.  On the morning of October 21, 2013, the plaintiff learned that marijuana and associated paraphernalia had been found in his dorm room by university personnel while he was away from the room for an extended period of time. The discovery had apparently been made when Seton Hall University employee Rae Esmores let herself into the room, supposedly to talk to the plaintiff. This is in spite of the fact that the university handbook promises "Each student has the right to expect reasonable privacy by University officials and personnel" and no phone call or email was ever placed to the plaintiff to accomplish the communication in question before this entry. To the plaintiff's knowledge, such an action had never taken place under such conditions before or since by a University Official.

4.  Possession of marijuana and marijuana paraphernalia anywhere on campus are violations of the Seton Hall University Community Standards.

5.  When the plaintiff was questioned during the investigation of the transgression (see paragraph 3) by Seton Hall University's Assistant Dean of Students Winston Roberts that very afternoon, who was acting in his capacity as a student conduct administrator, the plaintiff neglected to accept responsibility for either owning or knowing anything about the origin of any of the contraband found by university personnel in his dorm room to the extent that would have put him in violation of the University Community Standards. The

statements of the plaintiff's roommate constituted the only prima facie evidence that

existed to contradict the plaintiff's explanation of the truth.

6.  Roberts expressed that he did not believe the plaintiff's account of the truth because he

found the plaintiff's roommate more credible. This was a conclusion Roberts came to

erroneously, as it was averse to clear and convincing evidence that the plaintiff's

roommate's story was littered with blatantly untruthful statements. The fact that this

salient evidence of dishonesty did not seem to affect the credibility with which Roberts

viewed the account given by the plaintiff's roommate greatly concerned the plaintiff,

particularly because of the pre-existing pattern of University personnel to ignore evidence

which exonerated him from false accusations leveled against him. The individuals

identified by the plaintiff as capable of confirming his story were never questioned by

Roberts or any other school official.

7.  At the time, the Seton Hall University website stated that "If it is believed that a student

has participated in the violation of a Community Standard and he or she does not accept

responsibility for violating the Community Standard, the matter will be referred to the

Community Standards Review Board. At any time in the review process prior to a final

disposition, the Respondent may request a hearing by the Community Standards Review

Board."

8.  On the afternoon of October 21, 2013, the plaintiff was instructed to report to the second

floor conference room of Seton Hall University's University Hall for a meeting called by

Seton Hall University's Dean of Students, Karen Van Norman. In addition to Van

Norman and the plaintiff, the meeting was also attended by on-call psychologist, Dr. Priti

Shah, Roberts and a fourth individual employed by the university whose identity is

unknown to the plaintiff. Almost immediately upon the plaintiff's arrival, and divest of

any inquiry, Van Norman made a statement reflecting that she had already decided that the plaintiff must be stripped of his current standing as both a student and resident of the university community. At this time, the plaintiff invoked his right to a hearing, but was told by Van Norman that none would be had for him. At this point, Van Norman made it clear that any evidence that may have contradicted her pre-drawn conclusions was moot. The only reason for ignoring normal university procedure that Van Norman indicated was that her decision was based on a conversation she had had with a staff psychologist employed by the university, Dr. Jude Uy (with whom the plaintiff had had only one short phone conversation the entire semester, which had occurred weeks earlier, and was so insignificant to Uy that he did not even seek to schedule a follow-up appointment). From her conversation with Uy, she came to think that the plaintiff's prior diagnosis of major depressive disorder was wrong, and that the plaintiff was instead bipolar. Van Norman (who is not a mental health professional herself) clearly expressed that her suspicions regarding the plaintiff's inherent mental disposition were grounds on which to deny the plaintiff the accommodations, advantages, facilities and privileges of the University (such as normal due process, the right to live on campus, the ability to go to classes, etc.) from that point onward. Despite Van Norman's clearly expressed intent to change his student status, none of the necessary official written notification mandated by university policy was issued by Van Norman on this day.

9.   Midday on October 22, 2013, Van Norman instructed the plaintiff that he had until 12 noon on October 23, 2013 to let her know if he was willing to submit an application for medical withdrawal from the university. He was to meet with Van Norman at that time to either do so or inform her that he would not. She instructed him that if he did not voluntarily withdraw, she would be placing him on interim suspension, threatening that if

he did not apply for medical withdrawal, she foresaw interim suspension ruining his transcript because of how long she would ensure it would before he was able to begin attending classes again.

10. It should be noted that Seton Hall University's Fall 2013 handbook outlined a policy entitled "Involuntary Medical Leaves of Absence." The Policy stated "The University maintains the Department of Health/Counseling Services and Disability Support Services to serve the physical and emotional needs of students.... However, students who cannot adequately be helped by the available facilities and/or refuse to accept recommended emotional and/or medical treatment, and whose resulting behavior renders them unable to effectively function in the residential or University community without harming themselves, others, or disrupting the University community, may be required to leave following the described procedure below..." None of these described procedures were ever undertaken, suggesting that University personnel did not believe that the plaintiff was truly unable to effectively function in the residential and university community and/or suggesting that if they in fact came to these erroneous conclusions, they preferred to act on them punitively.

11. The University Handbook effective at the time stated that "The Community Standards structure and the procedures used in it are designed to be educational and corrective, rather than punitive."

12. On the night of October 22, 2013, the plaintiff, realizing that he would not be placed on Involuntary Medical Leave and seeking to refresh his memory of policies he had previously read concerning the rare circumstances in which the Dean of Students could circumvent the normal University Community Standard procedure (see paragraph 7) to

place a student on interim suspension, came across applicable university policy in two

locations.

13. The University Student Handbook effective for the fall semester of 2013 read "A

situation may arise when, in the judgment of the associate vice president and dean of

students or vice president for Student Affairs and Enrollment Services or designee, the

continued presence of an individual at the University presents an immediate danger to the

fulfillment of the educational mission of the University or to the life, health, welfare,

safety or property of any member(s) of the University community. The accused person

may be subject to a change in student status including immediate denial of campus

residency and academic activities such as attending classes, contacting instructors, etc., or

suspension from the University pending the outcome of an initial conference or judicial

hearing.... The associate vice president and dean of students, the vice president for

Student Affairs and Enrollment Services or their designee, may authorize a change in the

student's status *after gathering and considering the necessary information* (including but

not limited to a consultation with a member of the Counseling Services staff; the dean of

the college/school where the student is enrolled; the director of public safety and security;

the director of housing and residence life; other University staff; *and the student*, if

possible.), and determine if any change in status is warranted. Notification of any change

of the student's status and the reasons for it are communicated to the student, in writing,

within 24 hours of the decision. The *respondent is provided with a letter of charges and*

*the terms of the immediate action changing the student's status.*"

14. Seton Hall University's official website at the time explicitly expressed the limited

"situation[s]" (see paragraph 13) referenced in the University Handbook in which interim

suspension can be applied. It stated "*An interim suspension may be imposed only: a) to*

*ensure the safety and well-being of members of the University community or preservation*
*of University property; b) to ensure the student's own physical or emotional safety and*
*well-being; c) to prevent disruption of, or interference with, the normal operations of the*
*University; d) or to protect the best interests of the University."*

15. The plaintiff showed up early for the meeting Van Norman had set for 12 noon on
October 23, 2013. Before the time scheduled for the meeting, the plaintiff had requested
Seton Hall University employee and friend Joshua Reda be allowed to accompany him to
the meeting. This should have been the plaintiff's right according to the university
handbook if "in the opinion of a professional member of the Department of Health/
Counseling Services and/or Disability Support Services [he had been] unable to be
adequately helped by the center or other available facilities, and [his] condition
render[ed] him unable to function in the University community without harming himself
or others and/or disrupting the educational mission of the institution" because the
handbook goes on to state that in these situations students *"may be accompanied by a*
*support person (friend, relative, faculty member, etc.) to scheduled appointments with*
*university personnel."* This request, made by the plaintiff in order to secure an unbiased
witness to the proceedings, was denied, and the plaintiff was forced to relay this message
to Joshua Reda over the phone. The other reason for which the plaintiff had showed up
early - to see a priest who worked in the building - was also denied, with no reason
provided.

16. When the meeting began on October 23, 2013, Van Norman asked the plaintiff whether
he would apply for medical withdrawal or have her place him on interim suspension. The
plaintiff, indicating to the applicable university policy (see paragraph 14) he had printed
out and brought with him, questioned Van Norman regarding which of the four reasons

for which someone can be placed on interim suspension that she believed gave her the right to place him on interim suspension. The plaintiff even listed the reasons out loud for the dean's convenience. A dismissive Van Norman ignored the question and asked one more time if the defendant was willing to apply for medical withdrawal. The plaintiff suggested that he believed that Van Norman was only pushing him to volunteer to do so because, as much as she personally wanted to see him banished, no conditions existed for which she felt comfortable putting him on interim suspension because of the potential legal repercussions of such an action. At this time, Van Norman's expression became visibly perturbed by the challenge to her authority over the matter in question. She stated that as of that moment, the plaintiff was officially being placed on interim suspension. When the plaintiff asked which of the exclusive reasons enabling such an action that she was asserting, Van Norman scoffed contemptuously. Apparently unable to come up with a respectable reason on the spot, she stated that she would explain later in an email.

17. The plaintiff was perfectly willing to point Van Norman towards witnesses and/or evidence to help her understand the logic, predictability and reasonableness of all his endeavors over the course of the week which began on Thursday, October 17, 2013 and ended October 23, 2013. The failure of Van Norman to ever disclose what behavior she found to present "an immediate danger" before suspending him made it impossible for him to do so, and impossible for her to gather and consider information necessary for a comprehensive assessment of the plaintiff's disposition. Indeed, she showed no interest in gathering or considering any information from the plaintiff or any other source that could have shed light of the plaintiff's thought processes.

18. The email that university policy required Van Norman to send (see paragraph 13) regarding all charges for which she was implementing the interim suspension on the

plaintiff was sent to the plaintiff on October 23, 2014. It addressed the reason for the

implementation of an interim suspension on the plaintiff with only one sentence, which

stated "Based upon the actions you have exhibited this week [beginning Thursday

October 17 and ending Wednesday October 23] including, but not limited to, extreme

mood swings and erratic behavior, you are placed on interim suspension." All subsequent

attempts on the part of the plaintiff to learn from Van Norman what mood swings and/or

actions that occurred the week she was referencing with this statement and/or its relation

to constituting one of the exclusive reasons (see paragraph 14) for interim suspension

were in vain. She would not even state for the record what the extreme moods were that

she was alleging the plaintiff swung between on multiple occasions.

19. Tracy Gottlieb is Seton Hall University's Vice President of Student Services, whose

responsibilities include overseeing the office of the Dean of Students, so the plaintiff

assumed that when he informed her of the details of the situation, she would step in to

enforce the plaintiff's rights. Thus, he did so in an email sent to Gottlieb on October 29,

2013 at 8:58 PM. On October 30, 2013 at 1:26 PM, Gottlieb sent the plaintiff an email in

response which inaccurately stated that she had reviewed the actions of Roberts and Van

Norman and determined that "standard university policy was followed." Gottlieb, too,

could not and would not state an exclusively permissible reason she found for which the

plaintiff had been put on interim suspension, or give any information regarding the

inquiry she made before rubber stamping the work of her subordinates.

20. Since leaving the meeting called by Van Norman on October 21, 2013, the plaintiff began

taking steps he believed would allow him to obtain the services of a lawyer willing to

fight pro bono for the rights he had been denied, as the plaintiff lacked the financial

means to pay for a lawyer's services himself. To the plaintiff, it was apparent that

litigation was the only chance he had at keeping Seton Hall University from continuing to discriminate against him based on its belief that he had bipolar disorder and his only chance at making the university follow its own policies. These efforts were ongoing until early August 2014, when the plaintiff learned about diversity jurisdiction and fully committed to learning the procedures of the court so that he could successfully file suit pro se.

21. On November 12, the plaintiff was evaluated by Dr. Amjad Bahnassi, this date being the earliest he could possibly get any psychiatrist to meet with him following the events of October 21, 2013. After being psychiatrically assessed, the plaintiff asked Dr. Bahnassi if he would be willing to write a letter stating that he was "not a threat to himself, to others, and that he could manage his behavior effectively to be a part of a community environment without disruption." Bahnassi made remarks suggesting that it was not a guarantee he could make about anyone, being that he was only a psychiatrist, not a psychic. However, to the extent that he could make such definitive remarks about anyone, Bahnassi said that he could do so for the plaintiff, and that he would in fact be willing to address a letter saying as much to whom it may concern.

22. Seton Hall University form for requesting Medical Withdrawal requires that "documentation from [a] treating medical professional must be provided to [the] Dean of Students.... That documentation must specify the medical reason and the dates that the student has/ will be absent."

23. The plaintiff's parents, motivated by the desire to reclaim some of the money they had spent for tuition and room and board for the fall semester, among other motives unrelated to the plaintiff's mental fitness, forced him to sign an application for medical withdrawal that they had filled out for him. Amongst the means of pressure they used to force him to

sign the application was threatening that if he refused to sign, he would not be allowed to attend the Thanksgiving meal they were hosting for the rest of the plaintiff's family. Skeptical that any member of psychological services would jeopardize their professional integrity to submit documentation supporting the notion that he was mentally unfit to function within the University setting, and knowing that Dr. Bahnassi's findings would reveal the lack of objectivity of any such documentation should it actually be composed, the plaintiff submitted to the pressure of his parents who otherwise would have made him spend Thanksgiving alone when he had nowhere else to go, and to the pressure of the University, who had seen to it that he would get no refund of his tuition and fees and that his transcript would be ruined otherwise.

24. All factors contributing to the signing of the application for medical withdrawal by the plaintiff (including those not elaborated upon here for the sake of keeping this complaint as concise as possible) were predicated on circumstances that would not have existed had it not been for the unlawful acts of Seton Hall University personnel. As the plaintiff suspected, the medical documentation required for medical withdrawal was never submitted. Furthermore, the plaintiff's signature was acquired only through undue influence (see paragraph 23), showing that the plaintiff did not withdraw officially or willingly.

25. It should be noted that Dean of Students Karen Van Norman, in recognition of the fact that the 2013-2014 handbook had not given her the authority to take the action she did against the plaintiff, has since updated the university policy outlined in paragraph 14 (see paragraph 14 for comparison) to instead read "An interim suspension may be imposed *at the discretion of the Dean of Students for reasons including but not limited to*, a) to prevent disruption of, or interference with, the normal operations of the University; b) to

protect the best interests of the University; c) to ensure the safety and well-being of members of the University community or preservation of University property; d) to ensure the student's own physical or emotional safety and well-being;." The legitimacy the old policy gave to claims like mine must have been apparent even to her.

Claim for relief

Count I

1. Plaintiff incorporates paragraphs 3-25

2. As of the end of August 2013 the plaintiff's tuition, room and board and other necessary fees required to attend classes and assume residency at Seton Hall University were paid in full and accepted by the university.

3. Seton Hall University failed to conform its treatment of the plaintiff to the standards established in its own student handbook and on its official website which the plaintiff reasonably understood to be required by both contract law and the laws of association (a conclusion supported by common law). As a result, the University is responsible for several breaches of contract and the laws of association. One breach occurred when the Dean of Students made her decision to place the plaintiff on interim suspension without granting the plaintiff any meeting that could sensibly be considered a conference or judicial hearing, or even a consultation (see "Facts," paragraph 13). This was a breach in and of itself, and played a part in another breach, which was the failure of the Dean of Students to "gather and consider necessary information" (see "Facts," paragraph 13). Doing so would have naturally included inquiry into anyone or anything the plaintiff could have pointed her towards to prove to her that placing him on interim suspension was not called for, warranted or just,

but she chose instead to decline the necessary work of an investigation. In the absence of any explicit reason befitting of the standard for interim suspension (see paragraph 14), Van Norman arbitrarily and capriciously placed the plaintiff on interim suspension anyway. The reasons communicated for the implementation of an interim suspension (see paragraph 18) were not amongst the only ones explicitly allowed by university policy (see paragraph 14). Even when given a chance by the plaintiff to connect the stated reasons for suspension to an explicitly permissible justification for interim suspension all presiding university personnel still declined to do so, apparently lacking the necessary imagination. Furthermore, Seton Hall University trampled the plaintiff's privacy rights (see "Facts", paragraph 3) . Moreover, the University had no right to deny the plaintiff his right to be accompanied by support personnel during the meeting in which he was informed of his unjust and outrageous suspension (see "Facts," paragraph 15) if they in fact believed he was mentally ill. Finally, the decision made by the Dean, if the conclusions she reported were ones she mistakenly but actually believed were truthful, her ensuing punishment was punitive rather than corrective (see "Facts" paragraph 10).

<br>

## Count II

1.  Plaintiff incorporates Facts, paragraphs 3-25 and Count I paragraph III
2.  Seton Hall University breached its duty to provide the basic, fundamental, procedural fairness to which it is obligated by common law.

## Count III

1.  Plaintiff incorporates Fact, paragraphs 1-25

2.  Seton Hall University withheld from the plaintiff accommodations, advantages,

    facilities and privileges in a manner that constitutes illegal discrimination because it

    perceived the plaintiff in a way that afforded him protected status under the New

    Jersey Law Against Discrimination, New Jersey Title 10:11 f.(1) and New Jersey

    Title 10:11 f.(2). Vital legislated definitions establishing such to be the case include

    P.L.1945, c.169 1.L. and P.L.1945, c.169 1.Q.


                                    Prayer For Relief

    Plaintiff requests that this court:

A. Issue a judgment declaring that the defendant must readmit the plaintiff under the

conditions in which it accepted him into the university; this includes the $67,500 left on

the University/merit scholarship that they promised him if he attended.

B. Issue a judgment declaring that the defendant waive all costs for tuition, and fees and

pay housing expenses for the plaintiff's first semester back at the university so he can

earn the credits the defendant's actions effectively made it impossible for the plaintiff to

receive for the fall semester of 2013. This action has a value of approximately $45,000.

C. Issue a judgment declaring that the defendant must count all classes the plaintiff has

taken since the described events towards his degree the same as it would have had the

same classes been taken at the University.

D. Issue a permanent injunction preventing the University from enacting any further

discipline or sanctions upon the plaintiff so long as the individuals who have exhibited

prejudice against him, such as Van Norman, Roberts and Gottlieb, still hold their current

positions of influence over the community standards review process. Also, that the

injunction include an order that no evidence the university becomes aware of strictly as a

result of this suit can be used against the plaintiff or any other member of Seton Hall University in university community standards proceedings.

E. Issue a judgment requiring the defendant to pay $36,054 per year for all the time their actions have kept him from attending classes. This is based on the average starting salary for a graduate from the University's school of Arts and Sciences, in which the plaintiff was enrolled, which he reasonably expected to begin making each year upon graduating.

E. Issue a judgment requiring the defendant to pay past and ongoing emotional distress damages for the emotional stress and trauma, homelessness, newfound difficulty trusting anyone, education, family and social disruptions, adjustment problems and anxiety and uncertainty and its resultant planning difficulty caused to the plaintiff by the defendant's illegal discrimination, in an amount to be determined by the court.

F. Punitive damages as encouraged by the New Jersey Law against discrimination to be applied in cases such as this one, in an amount to be determined by the court.

G. Award plaintiff the costs he incurs as a result of needing to bring suit such as court fees, trial fees, travel expenses and others as they occur, in an amount to be established in front of, and verified by the court.


Michael Matos

Michael Franklin Matos
Pro Se Plaintiff
97 Stoney Hill Road, Shrewsbury, MA, 01545
774-922-2071
mfmatos12@aol.com